ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                          )
                                                     )
Pave-Tech Inc.                                       )       ASBCA No. 61879
                                                     )
Under Contract No. N62473-09-D-1605                  )

APPEARANCE FOR THE APPELLANT:              Christopher R. Sillari, Esq.
                                             Finch Thornton Baird, LLP
                                             San Diego, CA

APPEARANCES FOR THE GOVERNMENT:            Craig D. Jensen, Esq.
                                             Navy Chief Trial Attorney
                                           Anthony Hicks, Esq.
                                             Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE WILSON
ON THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Navy moves for partial summary judgment, alleging that Pave-Tech, Inc. may not recover $1,557,754.28 of its $2,555,408.85 claim, related to field office overhead, because it has used a per diem rate method, deviating from its prior usage of a percentage cost basis, thus running afoul of our holding in *M.A. Mortenson Co.*, ASBCA No. 40750 *et al.*, 98-1 BCA ¶ 29,658 at 146,946 (Senior Deciding Group).  While we find that a dispute exists as to material facts related to $929,050.86 of appellant's appeal, appellant admitted it used the per diem rate for the other $628,703.42, yet used the percentage rate for its accounting up to now.  We grant the Navy's motion as it applies to that amount.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1.  Naval Facilities Southwest (Navy or government) awarded Contract No. N62473-09-D-1605 to Pave-Tech, Inc. (PT or appellant).  This was an Indefinite Delivery Indefinite Quantity contract for "airfield paving and heavy-duty paving areas for military operation vehicles at various locations within" several western and southwestern states.  (R4, tab 1 at 1-2)  This contract incorporated by reference Federal Acquisition Regulation (FAR) 52.233-1, DISPUTES (JUL 2002) – Alternate I (DEC 1991) and Defense Federal Acquisition Regulation Supplement (DFARS) 252.243-7001, PRICING OF CONTRACT MODIFICATIONS (DEC 1991) which applied FAR Part 31 and DFARS Part 231 (R4, tab 1 at 28, 30).

2.  The parties signed Task Order 12 on July 12, 2012, a firm fixed price contract for paving at Camp Pendleton, CA (R4, tab 10).

3. The parties held a kickoff meeting on August 29, 2012. The minutes for this meeting contained the following question and statement: "Field Overhead . . . Does your company charge their field overhead by the percentage method or daily rate method? Please be advised, that all of your DOD contracts must use the same method. It cannot change from contract to contract or modification to modification." (R4, tab 15 at 4235, 4239) The Navy also sent appellant a letter on December 11, 2012, stating:

> [I]n order to comply with [the FAR], the company must have established one method of field office overhead calculation based on the company's established and consistently followed accounting practices. This generally means calculating *either* a per diem rate (time distribution base) *or* a percentage mark-up (direct cost distribution base). The contractor's established method will be consistently applied in all changes for all contracts.

(R4, tab 18 at 4258) This letter contained NAVFAC Form 4330/43, which was a sample form instructing contractors to select either a percentage or per diem method of accounting for field office overhead (FOOH) costs (R4, tab 18 at 4261).

4. Appellant sent the Navy an updated Time Impact Analysis (TIA) by email dated June 13, 2013, revising an earlier submission on January 24, 2013 (app. opp'n ex. A (hereinafter Gonzalez decl.), ex. 15 at 1). This TIA was for "impacts incurred by Pave-Tech Inc. due to the Government actions that have caused delays to the overall project" (*id*. at 1). This showed the current schedule "has a slide or extension of [Contract Completion Date] of 278 Days" which included "198 Days On Going" for design delays (*id.* at 9). "Pave Tech will be seeking compensation for both impacts to our design and impacts to our construction. Please keep in mind these impacts are ongoing and as previously stated will be updated monthly." (*Id.*)

5. On November 6, 2013, appellant sent an email to the Navy concerning an anticipated modification (mod) to include installation of a gas line. Appellant stated "[t]he [estimated] pricing for this application would be $410,000[ ]to $515,000" but it didn't include "excavation, additional base installation with fabric" nor "dewatering or hazardous material handling and disposal." (App. supp. R4, tab 105 at 121) Less than an hour later, appellant sent another email, stating "the costs for the locating of the existing gas line have been removed from this proposal and will be added to the REA [Request for Equitable Adjustment] as discussed." The email also discussed "the [a]ttached 4330's, these rates have been accepted on the contract previously" and cited Task Order 11 (Gonzalez decl. ex. 10). Appellant also sent an email dated December 4, 2013, describing the "Standard Mark Ups that we will utilize on the Gas Line Modification in

the spirit of moving this project along: . . . 2. Primes Field Office Overhead-10%" (Gonzalez decl. ex. 3 at 2-3).

6. These discussions resulted in PT submitting "PROPOSAL/ESTIMATE FOR CONTRACT MODIFICATION" (PC) 05 to the Navy on December 19, 2013. This involved pricing for installation of new HDPE 6" gas line for a total cost of $296,384.87 inclusive of PT's 10% FOOH, priced at $21,807.15. (R4, tab 54 at 4433) The Navy's post-negotiation memorandum, dated the same day, applied the same 10% rate for FOOH in its summary of the overall price in reaching the final negotiated amount (gov't mot. tab E at 6). The parties executed bilateral Modification No. (Mod) 03, dated January 22, 2014, priced at $281,900. This mod contained a contractor statement of release accepting that this was "payment in full for both time and money and for any and all costs" related to this work, except for the contractor's "Time Impact Analysis (TIA) [which] is pending review by the Government. The TIA will be negotiated later upon Government review and if justified shall be considered separately." (R4, tab 58 at 4484-85) Mod 3 contained no explicit endorsement of the 10% FOOH figure.

7. Appellant submitted PC 08, dated March 24, 2014, to the government for pricing related to removal of various duct banks. This document contained a total price of $40,551.78,[1] with a 10% FOOH at $2,535.05. (R4, tab 61 at 4497) This was incorporated in bilateral Mod 05, signed July 3, 2014. The mod provided $42,657and zero calendar days, with no statement of release or reference to the TIA. (R4, tab 63 at 4502, 4504).

8. On September 8, 2014, PT submitted PC 03 to the Navy concerning various concrete renovations near the fuel apron for a total price of $622,768.62, including a 10% FOOH of $30,690.08 (R4, tab 64 at 4506). This was developed into bilateral Mod 06, executed October 27, 2014, for $622,768.62. This mod included a contractor's statement of release and carve-out for PT's previously submitted TIA which were almost identical to Mod 03. (R4, tab 66 at 4512-14)

9. The parties executed bilateral Mod 07 on December 18, 2014, concerning work on the "Type 4 Aircraft Rinse Facility ([Birdbath])" for $710,229. The mod noted PT's "indirect rates (prime field overhead . . .) are under review/analysis by the Government and are not included in the total amount of the modification." Further language concerning the contractor's statement of release and carve-out for the TIA were substantially similar to Mod 06. (R4, tab 67 at 4516-18)

10. Appellant submitted to the Navy a proposed estimate for a mod on May 18, 2015, concerning a "revised design of existing wet well to minimize dewatering requirements." This proposal had a total of $109,978.97 of prime and subcontractor costs

---

[1] Written in pen next to this figure, without any explanation, is $42,657.

3

with $4,681 representing 19.85% FOOH for PT.  (R4, tab 73 at 4614) That proposal was eventually incorporated into bilateral Mod 10 for $99,150.94, executed June 10, 2015.  This mod also contained the contractor's statement of release and carve-out for the TIA.  (R4, tab 74 at 4265, 4627)

11.  Appellant submitted PC 12 to the Navy on March 23, 2015, for additional costs related to concrete in the Birdbath, for a total of $36,599.71 inclusive of 19.85% FOOH at $4,035.81.  (R4, tab 71 at 4531)  Appellant submitted PC 14 to the Navy on September 18, 2015, which included FOOH of 22.79%, totaling $88,506.20 on form 4330.  This form stated "[i]f your company charges [FOOH] as a daily rate, please state that you charge a daily rate and leave the percentage line blank."  A Navy post-negotiation memorandum, signed by the contract specialist on September 30, 2015, stated the parties agreed to a FOOH rate of 13.51% and total of $180,114.06.  (Gov't mot. tab G at 3-4)  This total was incorporated in bilateral Mod 12, dated November 3, 2015, and covered indirect costs for Mod 07 and PC 12.  This mod contained an identical statement of release and TIA carve-out as Mod 10 (R4, tab 78 at 4667, 4669).

12.  Appellant provided an additional update to the TIA dated February 8, 2016, which primarily concerned "delays encountered and documented in the construction of the Bird Bath" (app. supp. R4, tab 120 at 673).

13.  PT submitted an REA dated June 12, 2017,[2] to the Navy for $2,555,408.85 and 221 calendar days.  The monetary aspect was broken down into various categories, with $779,717.16 of the $1,409,705.16 attributed to the East Apron Delay Costs going to the following:  Equipment in Use During Delay, Equipment on Delay (Stand By), Labor Delay Cost Post Mobilization, Equipment Site Maintenance, and Equipment Standby Post Mobilization.  The remaining $629,988 was broken into "Overhead Cost-Eichleay" calculated on a per diem basis and "Increased Design Cost."  Likewise, the Birdbath Delay Costs attributed $934,629.69 of the total $1,145,703.49 to the following:  Birdbath Labor Delay Costs, Equipment In Use During Delay, and Equipment Stand By Costs.  The remaining $211,074 was attributed to "Overhead Cost-Eichleay" which was calculated on a per diem basis.  (R4, tab 83 at 5391, 5395-96, 5398) This was incorporated into PT's certified claim, dated June 7, 2018, which claimed the same monetary and temporal compensation (R4, tab 87 at 1).  The government issued a contracting officer's final decision on August 22, 2018, denying the monetary aspect of the claim in full, but granting the requested 221 days (R4, tab 90 at 5460).

---

[2] One of the pages of the REA stated June 20, 2017 in the footer, and the digital signature on this document is dated June 16, 2017 (R4, tab 83 at 5390, 5392).  The parties appear to agree that it was sent on June 13, 2017 (app. opp'n, Statement of Genuine Issues of Material Fact ¶¶ 35, 37, 39).  Since the exact date is immaterial to our decision, we discuss it no further.

14. PT timely appealed the final decision on November 19, 2018. In appellant's complaint, filed December 20, 2018, PT characterized the requested amounts in its claim as including $779,717.16 for "extended field overhead" for the East Apron delays, and $934,629.69 for "extended field overhead" for the Birdbath delays (compl. ¶ 68).

DECISION

*The Parties' Arguments*

The government's motion for partial summary judgment seeks to disallow the $1,557,754.28[3] that PT characterizes as "extended field overhead" in its complaint (SOF 14). Having selected the percentage method of reimbursement for FOOH, the government argues appellant cannot now seek to recover these costs using a per diem method, alleging this would violate FAR 31.203(b), and our Senior Deciding Group's reading of that clause in *M.A. Mortenson Co.*, ASBCA No. 40750 *et al.*, 98-1 BCA ¶ 29,658 at 146,946, which we also relied on in *Caddell Constr. Co.*, ASBCA No. 49333, 00-1 BCA ¶ 30,702. (Gov't mot. at 14-15, gov't reply at 4-5) The Navy further argues that PT's characterization of these costs in its complaint as "field overhead" constitutes a judicial admission, so it cannot characterize them as equipment costs to survive this motion (gov't reply at 2).

PT argues first that $929,050.86 of the money at issue is actually "allowable direct equipment costs," thus only $628,703.42[4] is at issue (app. opp'n at 1, 2-6). PT also argues it and the government had agreed "that the extensive delays caused by the conduct of Respondent would be compensated as part of a TIA and REA submission that would later be priced in an equitable manner," thus it cannot be said that it had irrevocably chosen a single distribution base (*id.* at 6). So the argument goes, "the parties expressly reserved the right of Appellant to recover these time and cost impacts in an equitable manner in Mods 03, 06, 07, 10, and 12" (*id.* at 7). Finally, the parties disagree on the presence of special circumstances to justify a change to the cost distribution base, with PT pointing to "extraordinary and unusual" delays on the project caused by the Navy, with a passing reference to "the Government's threats and refusal to agree to compensate

---

[3] The Navy notes that the correct amount under the REA is $1,557,754.28, and the complaint "lead[s] to an overstated claim amount of $156,592.57" (gov't mot. at 14 n.1). PT does not challenge this statement in its opposition, and uses the $1,557,754.28 figure (app. opp'n at 1). For purposes of this motion, therefore, we accept this figure as the amount at issue.

[4] The parties discuss two other close numbers, but arithmetic leads us to this figure. The Navy's motion calls into question $1,555,754.28, and PT says $929,050.86 is attributable to something else. Subtracting $929,050.86 from $1,555,754.28 leaves $628,703.42, not $628,703.43 nor $628,673.43 as the parties contend. (App. opp'n at 1, gov't reply at 1 n.1)

Pave-Tech for cost and time impacts" (app. opp'n at 9; *see* gov't reply at 4-6). It finally attempts to distinguish *Mortenson* and *Caddell* on the bases of lack of presentation of evidence of special circumstances in either of those appeals (app. opp'n at 14).

*Discussion*

The standards for summary judgment are well established. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting conflicting facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). Nevertheless, "[t]he moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Once the government has made a prima facie case, however, appellant "must come forward with specific facts showing there is a genuine issue for trial" and must show what specific evidence could be offered. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation omitted). "The non-movant may not rest on its conclusory pleadings, but . . . must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial. . . . Mere conclusory assertions do not raise a *genuine* issue of fact." *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). *See also Colonna's Shipyard, Inc.*, ASBCA No. 59987 *et al.*, 16-1 BCA ¶ 36,518 at 177,902.

The central question which this motion presents is whether appellant may recover costs which it characterized as FOOH on a percentage basis while pricing mods, yet on a per diem basis when seeking an equitable adjustment. Both parties focus on the same passage from *M.A. Mortenson*. In that passage, we stated with regard to FAR 31.203(b):

> [The] reference to "a distribution base" requires use of a single distribution base for allocating a given overhead pool to cost objectives (such as changes). A contractor may choose any acceptable distribution base for allocating its job site overhead pool to particular cost objectives, but not more than one. We hold that appellant's practice of switching between a time distribution base (per diem rate) and a direct cost distribution base (percentage markup) for allocating job site overhead costs to changes, depending on whether a time extension was involved, on its face violated the FAR

6

requirement for a single distribution base for allocating a
given overhead pool.

98-1 BCA at ¶ 29,658 at 146,946  In a footnote, we further stated:

> We see no convincing rationale for routinely using different
> job site overhead distribution bases on changes that extend or
> shorten contract performance, say, by one day (or one week,
> or one month), and changes that do not.  A change order that
> does not change the contract completion date is simply at the
> center of a continuum which runs from a substantial increase
> in the time of performance at one end to a substantial
> decrease in the time of performance at the other.  Even when
> a contractor proves it has failed to recover its entire overhead,
> that is insufficient justification for permitting an accounting
> change from one distribution base to another (absent special
> circumstances involving a distortion of results, as
> contemplated by FAR 31.203(d)).

*Id*. at 146,948 n.7 (citations omitted).  Appellant repeatedly priced FOOH for the various
bilateral mods on a percentage basis, agreeing to seek additional compensation which
was still disputed in the TIA.  Almost all of the mods involved a carve-out for this
additional avenue of compensation, but does not discuss the method of calculation.
(SOF 6, 8-11)  The plain language of our holding in *Mortenson*, however, does not allow
recovering FOOH on a percentage basis in mods and per diem basis in an REA any more
than it allows switching between the two distribution bases from mod to mod.  This is
reflective of FAR 31.203(d), which states "[o]nce an appropriate base for allocating
indirect costs has been accepted, the contractor shall not fragment the base by removing
individual elements."

Appellant's "special circumstances" argument is unappealing.  While there are not
clearly defined boundaries as to what does and does not qualify as special circumstances,
we have disallowed the use of per diem costs in a materially similar fact pattern.  In *Watts
Constructors, LLC*, ASBCA No. 59602, 15-1 BCA ¶ 35,873 at 175,372, appellant Watts
attempted to recover FOOH on a per diem basis for allegedly government-caused delays
related to a mod after electing and employing the percentage method for all contract work
beforehand.  The government had agreed to some of the costs associated with the mod,
but the parties disputed other costs associated with the delay of the mod, resulting in an
agreement to allow Watts to submit the claimed costs in a TIA.  Watts argued it should be
allowed to recover some of these costs on a direct basis because they "were not incurred
for the same purpose and in a like manner as field office overhead costs." *Id.* at 175,373.
In denying that argument, we did not find special circumstances there, nor do we now.
*Mortenson* specifically stated that failure to recover a contractor's entire overhead would

not by itself constitute special circumstances allowing a retroactive accounting change. 98-1 BCA ¶ 29,658 at 146,946 n.7. Run-of-the-mill government-caused delays alone, like those forming the basis of this appeal, are also not so special as to qualify, even where they more than double the performance period.

PT makes several other supporting points, but we also find them lacking. PT's argument that it should be able to recover FOOH under the equitable principles of the Changes clause is no more availing than it was when Watts made a nearly identical argument (app. opp'n at 12-13); *Watts*, 15-1 BCA ¶ 35,873 at 175,374. Likewise, PT's argument employing FAR 31.201-2(c), and suggesting it must implicitly allow some inconsistent accounting methods is identical to the argument advanced and rejected in *Caddell Constr. Co.*, ASBCA No. 53144, 02-1 BCA ¶ 31,850 at 157,398-99 (app opp'n at 13). PT also argues that it agreed to these mods "under economic duress, and under threat of liquidated damages" but does not meaningfully develop this argument (app opp'n at 8). PT never indicates that the government either caused or directly took advantage of its economic duress, nor details the government's culpability in forcing PT to work "under threat of liquidated damages" beyond having a liquidated damages provision in the contract (*see, e.g.*, app opp'n at 8, Gonzalez decl. at 7). This is likewise not discussed in the complaint. PT does not show "what specific evidence could be offered at trial" to prove these theories, thus they do not survive summary judgment. *Pure Gold, Inc.*, 739 F.2d at 626-27.

Another of PT's central arguments is that the parties agreed "the extensive delays caused by the conduct of Respondent would be compensated as part of a TIA and REA submission that would later be priced in an equitable manner" (app. opp'n at 6). As evidence of this agreement, appellant points to the claim release carve-outs for the TIA submission in the mods, as well as portions of a declaration by Ben Gonzalez, PT's Military Division Manager (app. opp'n at 6-9, Gonzalez decl.). However, this agreement, effectuated in mods 3, 6, 7, 10, and 12, is only for PT to *pursue* its disputed costs in a TIA which would not be subject to the Statements of Release in each mod (SOF 6, 8-11). PT has done this (SOF 4). Further, "Pave-Tech and the Government agreed that the TIA would include pricing for cost impacts determined in an equitable manner" (Gonzalez decl. at 4). Suggestions that the government required PT to submit its pricing for mods using a percentage method or its TIA using a per diem method are unsupported. PT points to no evidence of anything more, such as an agreement that the Navy would accept or grant the TIA or REA once submitted. Thus, it's unclear how this agreement would help PT avoid *Mortenson*'s bar on switching accounting methods.

PT's last argument concerns $929,050.86 of this amount, which it claims is actually direct equipment costs expressly allowable under FAR 31.105(d)(2), and not FOOH (app. opp'n at 5). The Navy claims otherwise, calling the characterizations in PT's complaint judicial admissions by which PT should be bound (gov't reply at 2-3).

The complaint characterizes a total of $1,714,346.85[5] as "extended field overhead," a different term than FOOH (SOF 14). This same amount is attributed to various other costs aside from FOOH in the REA supplement, which was incorporated into the claim (SOF 13). Even if appellant's complaint did explicitly refer to these costs as FOOH, the doctrine of judicial admissions does not rigidly apply where a complaint's allegations are readily contradicted by evidence in the record. *N.L.R.B. v. Merrill*, 388 F.2d 514, 518-19 (10th Cir. 1968) (petitioner was not bound by allegation in complaint where evidence showed allegation was incorrect, because complaint can be amended to conform to evidence where justice so requires). PT does, however, agree that the remaining $628,703.42 (see supra fn. 4) of its appeal constitutes FOOH costs "using a daily rate calculation" (app. opp'n at 1, 15). This does run afoul of our holding in *Mortenson*. Thus, we grant the government's motion as to this amount only. The remaining $929,050.86 is, at minimum, subject to a dispute of material fact and, as such, cannot be resolved by summary judgment.

<u>CONCLUSION</u>

For the reasons stated above, the government's motion is granted in part, as to $628,703.42 of appellant's appeal, and denied in part as to the remaining $929,050.86 at issue in this appeal.

Dated: March 23, 2022

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

---

[5] See supra, fn. 3.

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61879, Appeal of Pave-Tech Inc., rendered in conformance with the Board's Charter.

Dated:  March 23, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals